IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| vs. ) | Criminal No. 09-163 |
| ) | |
| TRAVON DAWKINS, ) | |
| ) | |
| Defendant. ) | |

O R D E R

AND NOW, this 15th day of October, 2009, upon consideration of Defendant's Motion to Suppress Evidence (Document No. 25) filed in the above captioned matter on September 18, 2009, and the Brief in Support thereof (Document No. 27), the Government's Responses thereto (Document Nos. 26 and 28), the Defendant's Reply (Document No. 30), and after the testimony and evidence presented at the September 14, 2009 hearing regarding Defendant's Motion,

IT IS HEREBY ORDERED that Defendant's Motion to Suppress Evidence is DENIED.

Defendant, Travon Dawkins, is charged with possession with the intent to distribute 5 grams or more of cocaine base, a Schedule II controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(B)(iii). The present motion seeks to suppress evidence in this case based on alleged violations of Defendant's Fourth Amendment rights.

On September 14, 2009, the Court held a hearing at which time testimony and evidence were presented in regard to Defendant's motion. The Government presented the testimony of two witnesses, Paul Cain and Robert Sealock, and offered four exhibits, which the Court admitted. In addition, the parties stipulated as to what testimony Michael Warfield would offer if called as a witness. On the basis of this evidence and the parties' filings, the Court finds no merit in Defendant's arguments.

## I.  Facts

The facts relevant to this motion are largely undisputed. On February 23, 2006, at approximately 3:30 p.m., narcotics agents with the Pennsylvania Attorney General's Office advised members of the Aliquippa Police Department, including Officers Paul Cain and Robert Sealock,[1] that there was an active arrest warrant outstanding for an individual named Billy Love Dawkins[2] for felony violations of Pennsylvania drug trafficking laws. A copy of the arrest warrant was provided to the officers. Both Officer Cain and Officer Sealock were personally familiar with Billy Love Dawkins and were, as discussed below, aware of his history of violent behavior and involvement with narcotics and firearms.

---

[1]  Officers Cain and Sealock had recently begun their shifts.

[2]  Billy Love Dawkins is currently a criminal defendant in a separate case filed at Criminal No. 08-412.

Later that day, at approximately 5:00 p.m., Officer Cain observed Billy Love Dawkins in the passenger seat of a maroon Ford Crown Victoria at the corner of Waugaman Street and Kennedy Boulevard in Aliquippa. Officer Cain radioed Officer Sealock and informed him of the situation, and Officer Sealock responded and approached the area. While speaking with Officer Sealock, Officer Cain observed the vehicle in which Billy Love Dawkins was a passenger turn onto Main Street. After Officer Sealock had arrived, Officer Cain initiated a stop of the vehicle on Main Street, a street where there are a reasonable amount of people present at that time of day. Officer Sealock pulled his vehicle in front of Defendant's car. As soon as the vehicle was stopped, the driver, later identified as Defendant Travon Dawkins, quickly jumped out and took a step away from the vehicle, leading the officers to reasonably fear that he was attempting to flee on foot. Both officers drew their weapons, and Officer Cain ordered Defendant to stop and get back into the vehicle. Defendant complied with this request.

Officer Cain went to the passenger side of the vehicle and arrested Billy Love Dawkins pursuant to the warrant. Very shortly after the arrest, Officer Sealock approached the driver side of the vehicle and ordered Defendant out of the vehicle. When Defendant exited, Officer Sealock observed two hand-sized bulges in Defendant's front pants pockets. Because of Defendant's behavior

and his association with Billy Love Dawkins, Officer Sealock conducted a <u>Terry</u> frisk of Defendant by patting down Defendant's outer clothing. During the frisk, Officer Sealock felt what he recognized, based on his training and experience, [3] to be crack cocaine inside Defendant's right front pants pocket and marijuana in his left front pants pocket. He retrieved 69 plastic baggies that contained a total of 8.6 grams of crack cocaine from the right pocket and 26.6 grams of marijuana from the left. Defendant was subsequently identified as Travon Dawkins, brother of Billy Love Dawkins.

Prior to the encounter, the officers were aware of the following facts regarding Billy Love Dawkins:

(1) There was an active arrest warrant for Billy Love Dawkins for felony drug trafficking.

(2) Billy Love Dawkins was known as a long-time, large-scale drug trafficker in the area and a member of the Linmar Terrace crew, a group well known to be a major drug-trafficking operation in the Aliquippa area.

(3) Billy Love Dawkins had previously been involved in unlawful activity involving guns and narcotics.

(4) Specifically, Officer Sealock was aware that, on October 27, 2005, an individual had advised Aliquippa police that Billy Love Dawkins was the head of the Linmar Terrace crew and advised of the extent of the group's drug trafficking and of Dawkins' connections

---

[3] Officer Sealock has been a police officer for around 15 years and has been involved in approximately a hundred drug investigations. The majority of these cases involved crack cocaine. He has also been a member of several drug task forces, including the West Hills Drug Task Force and the Attorney General's Office BNI Unit, and has received formal training on drug enforcement issues. He testified that, based on his training and experience, he is familiar with the look and feel of crack cocaine.

>   with Anthony Dorsett. The individual also advised the police that Dawkins was stockpiling military-grade weapons and that, if the police became involved in his organization's operations, he would "order an all out war on the Aliquippa Police and the rest of the city." The three officers that the Linmar crew most discussed killing included Officer Sealock.
>
> (5) Further, the officers were aware that when Billy Love Dawkins had been arrested on December 14, 2005, he had in his possession a loaded semi-automatic handgun and was wearing a bullet-proof vest.
>
> (6) Moreover, the officers were aware that, on January 2, 2006, police responding to a call that shots had been fired found Billy Love Dawkins as the passenger in a car driven by Gregory Johnson. Johnson was found to be in illegal possession of a firearm and was subsequently convicted and sentenced on this charge.
>
> (7) The officers had further knowledge of Billy Love Dawkins' general involvement in unlawful activity.

The officers were also aware generally that drug traffickers often carry firearms and that they are often in the company of others engaging in drug trafficking and/or armed individuals.

II.     **Discussion**

Based on these facts, Defendant contends that the stop of his vehicle by police was not supported by probable cause or reasonable suspicion, and that the resulting frisk, search of Defendant's person, evidence seized, and Defendant's answers to questions are all tainted by the illegality of the initial stop under the "fruit of the poisonous tree" doctrine pursuant to Wong Sun v. United States, 371 U.S. 471 (1963). Defendant further argues that the frisk and search of his person was conducted without probable cause and was illegal because police had no reason to

5

believe that he was armed and dangerous. He therefore claims that the police exceeded any authority under <u>Terry v. Ohio</u>, 392 U.S. 1 (1968). The Court disagrees.

### A. <u>Defendant Was Properly Detained</u>

First, the initial stop of the vehicle driven by Defendant on February 23, 2006, was clearly permissible. Officers stopped the vehicle to execute an arrest warrant on the passenger of the vehicle, an individual they knew to be Billy Love Dawkins, the subject of the warrant. The officers had a copy of the warrant and were familiar with Billy Love Dawkins at the time they identified him and stopped the vehicle. As such, the officers were justified in stopping Defendant's vehicle. <u>See</u> <u>United States v. Rosario</u>, 305 Fed. Appx. 882, 885 (3d Cir. 2009); <u>United States v. Fields</u>, 176 Fed. Appx. 327, 330 (3d Cir. 2006).

### B. <u>There Was Reasonable Suspicion to Frisk Defendant</u>

Once police properly stopped the vehicle, they were entitled to frisk Defendant. An investigatory stop and frisk is permissible under the Fourth Amendment so long as two conditions are met. First, the investigatory stop must be lawful, <u>i.e.</u>, the officer must have a reasonable suspicion that the person apprehended is committing or has committed a criminal offense. Second, to proceed from a stop to a frisk, the officer must reasonably suspect that the person stopped is armed and dangerous. <u>Terry v. Ohio</u>, 392 U.S. 1 (1968); <u>Arizona v. Johnson</u>, 129 S. Ct. 781, 784 (2009). In

6

Johnson, the Supreme Court held that "in a traffic-stop setting, the first Terry condition – a lawful investigatory stop – is met whenever it is lawful for police to detain an automobile and its occupants pending inquiry" into the basis for the stop. 129 S. Ct. at 784. In other words, "police need not have, in addition, cause to believe any occupant of the vehicle is involved in criminal activity." Id.

Since Officers Cain and Sealock lawfully stopped Defendant's vehicle and detained Defendant pending inquiry regarding Billy Love Dawkins' arrest, the first prong under Johnson is met. Moreover, although Defendant did not ask to or express a desire to leave the scene, officers observed him quickly exiting and taking a step away from the vehicle, gestures they interpreted as Defendant attempting to flee. The Court finds this interpretation to be reasonable and finds that the officers did, indeed, have reason to believe that Defendant was attempting to flee. "Flight from a non-consensual, legitimate traffic stop (in which the officers are authorized to exert superintendence and control over the occupants of the car) gives rise to reasonable suspicion" to detain, even when it is a person other than the object of the police action that flees. United States v. Bonner, 363 F.3d 213, 218 (3d Cir. 2004). See also United States v. Mercer, 316 Fed. Appx. 183, 187 (3d Cir.

2009). As such, police would have had reasonable suspicion to detain Defendant.[4]

Officer Sealock's frisk of Defendant also comported with the Fourth Amendment. It is well-established that an officer may conduct a brief investigatory pat-down search of the outer clothing when the officer has a reasonable, articulable suspicion that the defendant may be armed and dangerous, regardless of whether the

---

[4] While the issue does not appear to be before the Court here, it should be noted that it is not entirely clear under the law that a police officer can use force or a show of force to detain a passenger who wishes to leave the scene of a traffic stop. The case law is clear that police may order the occupant of a lawfully stopped vehicle to exit the vehicle, see Maryland v. Wilson, 519 U.S. 408 (1997), and to remain in the vehicle, see United States v. Moorefield, 111 F.3d 10, 11 (3d Cir. 1997), and that a passenger stopped during a traffic stop is deemed to be in custody for purposes of standing to assert Fourth Amendment issues, see Brendlin v. California, 551 U.S. 249 (2007). There is also some case law supporting the right of police to order an occupant who is not the subject of the traffic stop to get back in the vehicle if he or she attempts to leave. See, e.g., United States v. Sanders, 510 F.3d 788 (8th Cir. 2007). However, the Supreme Court has not directly decided the extent of the authority of a police officer to forcibly detain a passenger who indicates an intent to leave. See Wilson, 519 U.S. at 415 n.3; Sanders, 510 F.3d at 789 (stating that the Supreme Court has not addressed the issue of whether ordering a passenger to re-enter a vehicle without a basis to infer that he was involved in criminal activity violates the Fourth Amendment); Vehicle Search Law Deskbook § 5.5 n.4 (2009) ("Not decided by the Court in Brendlin . . . – and still an open question – is whether police, after ordering a passenger out of a vehicle, may use force or a show of force to keep the passenger at the scene during the traffic stop.").

Here, when the vehicle was stopped so that officers could arrest Billy Love Dawkins, Defendant, who, although he was the driver of the vehicle was not the object of the officers' attention, apparently sought to flee. Officer Cain, by pulling his firearm and ordering Defendant to stop and re-enter the vehicle, prevented him from doing so, and therefore clearly detained Defendant. However, Defendant does not argue, nor is there anything in the record to indicate, that he was attempting to leave the scene in such a manner as would cast doubt on the officers' authority to detain him. Essentially, either Defendant was attempting to flee, which provided reasonable suspicion to detain him, or he was intending to stay, in which case the police could exercise reasonable authority over him. Either way, his detention was justified.

officer had probable cause to arrest the defendant for a crime. See Terry, 392 U.S. at 27; Illinois v. Wardlow, 528 U.S. 119, 127 (2000). Reasonable suspicion is a less demanding standard than probable cause. See Johnson, 129 S. Ct. at 786; United States v. Valentine, 232 F.3d 350, 353 (3d Cir. 2000). When deciding whether an officer acted reasonably when conducting a Terry frisk, due weight must be given "to the specific reasonable inferences which he is entitled to draw from the facts in light of his experience." Terry, 392 U.S. at 27. The issue is not whether the officer was absolutely certain that the defendant was armed, but rather is "whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." Id.

The facts set forth above demonstrate that Officer Sealock did have reasonable suspicion that Defendant may be armed and dangerous. The primary factor is that Defendant was accompanying Billy Love Dawkins, a person known to the officers to be a dangerous person involved with narcotics and firearms. He was well known to be a major drug trafficker in the area. Officer Sealock had been informed that Billy Love Dawkins had been stockpiling weapons to go after the police if they interfered with his drug trafficking, and that he was one of the three officers Dawkins was particularly interested in killing. When Dawkins had been arrested just a few months earlier, he had been in possession of a loaded semi-automatic

weapon and wearing a bullet-proof vest. He had, a few weeks earlier, been in a vehicle stopped by police where his driver had been armed. The charges for which Dawkins' arrest warrant had been issued were serious, and given the statements made to police regarding Dawkins' intent to come after the police if they tried to stop him, the police were understandably cautious.

In addition to this, the officers were aware, from their experience, that drug traffickers are often armed and often travel with other drug traffickers who may be armed. Defendant, when the vehicle was first stopped, appeared to attempt to flee, further arousing the officers' suspicion. Based on all of the circumstances, Officer Sealock had sufficient reasonable suspicion to conduct a pat-down of Defendant's outer clothing to ensure the safety of the officers and the community.[5]

Indeed, other courts have made the same finding based on similar facts. In <u>United States v. Rivers</u>, 121 F.3d 1043 (7th Cir. 1997), the Seventh Circuit found that officers lawfully frisked the passenger of a car driven by a person who was wanted on an outstanding arrest warrant for domestic battery and who was suspected to have been dealing crack cocaine. In so holding, the

---

[5] The Court does note that, although the officers apparently had prior knowledge of Defendant's affiliation with the Linmar Terrace crew and of his possession of firearms, the officers testified that they did not know who Defendant was at the time of the frisk and therefore could not have been relying on that knowledge. Nonetheless, as explained herein, there was still ample reason for the officers to have reasonable suspicion that Defendant was armed and dangerous.

court relied on the fact that the traffic stop was in a very public place and the fact that drug dealers are often accompanied by armed guards. See id. at 1045-46. Likewise, in United States v. Doan, 219 Fed. Appx. 663 (9th Cir. 2007), the Ninth Circuit held that officers had reasonable suspicion to detain and frisk the defendant, who was the passenger of a vehicle pulled over to execute an arrest warrant against the driver. The court found that the defendant had made several furtive movements, that he was in the presence of an individual arrested pursuant to a warrant, that the defendant had been removed from the vehicle, increasing his ability to attack an officer, and that the stop occurred at night. See id. at 665. In United States v. Vaughan, 718 F.2d 332 (9th Cir. 1983), the court held that officers could frisk the defendant passenger of a vehicle stopped to arrest the driver and another passenger when the defendant had attempted to walk away from the car.

The Court is mindful that "a person's mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause to search that person." Ybarra v. Illinois, 444 U.S. 85, 91 (1979). Likewise, the Court is aware that the Third Circuit has not expressly adopted the "automatic companion" rule whereby "any companion of an arrestee would be subject to a 'cursory pat-down' reasonably necessary to give assurance that they are unarmed." United States v. Lansdowne, 296 Fed. Appx. 268, 269 (3d Cir. 2008). However, here, the very

dangerous nature of apprehending Billy Love Dawkins, a known drug trafficker and danger to police, the fact that drug traffickers like Dawkins often travel with armed individuals, and Defendant's own suspicious behavior in attempting to flee created a situation where the officers were warranted in the belief that their safety or that of others was in danger. Even though, as Defendant argues, the officers did not specifically see a weapon, nor did Defendant's behavior specifically indicate that he was carrying a weapon, the totality of the circumstances provided reasonable suspicion that he might well be armed and dangerous.

Courts have recognized that traffic stops are dangerous encounters for police. See Wilson, 519 U.S. at 413; Moorefield, 111 F.3d at 13. This, as discussed, was far from the run-of-the-mill traffic stop. Officers Cain and Sealock were attempting to apprehend a person they believed to be a very dangerous individual, and Defendant's behavior did nothing but heighten their concern. The frisk of Defendant was entirely reasonable under these circumstances.

### C. Officers Properly Seized the Narcotics

Of course, during Officer Sealock's frisk of Defendant, he did not ultimately find any weapons, but rather, narcotics, including the crack cocaine that forms the basis for the charge against Defendant in this case. It is well-established that an officer is permitted to seize contraband found during a lawful Terry

frisk. See Minnesota v. Dickerson, 508 U.S. 366 (1993). Defendant, however, apparently is arguing that Officer Sealock's frisk exceeded the proper scope of a Terry frisk and violated the "plain feel" doctrine.

The purpose of a Terry frisk is to search for weapons, and the scope of the search is limited to this protective purpose. See Terry, 392 U.S. at 18; Adams v. Williams, 407 U.S. 143, 146 (1972). As the Third Circuit explained in United States v. Yamba, 506 F.3d 251 (3d Cir. 2007), the Dickerson decision essentially endorsed the "plain feel" doctrine by permitting officers to seize contraband they find while properly frisking for weapons. However, as these cases demonstrate, the search must be for weapons, and the contraband must be identified in the course of searching for weapons, to be admissible under the plain feel doctrine.

The Third Circuit discussed the parameters of the plain feel doctrine in Yamba. The court there stated:

> The proper question under Dickerson, therefore, is not the immediacy and certainty with which an officer knows an object to be contraband or the amount of manipulation required to acquire that knowledge, but rather what the officer believes the object is by the time he concludes it is not a weapon.

Id. at 259. The court emphasized that if an officer, given his or her training and experience, develops probable cause to believe that an object is contraband before eliminating the possibility that the object is a weapon, the officer may perform a more intrusive search

13

and, if the object is indeed contraband, may seize it. See id. "It is not key whether [the officer] was certain that the object in [the defendant's] pocket was contraband by the time he knew it not to be a weapon; what is key is whether [the officer] had probable cause to believe that it was and this occurred at the same moment or before he determined that [the defendant] had no gun on his person." Id. at 260. An officer can further manipulate an object after forming the belief it is not a weapon to confirm that it is indeed contraband, so long as probable cause existed prior to ruling out the possibility of the object being a weapon. See id.

Here, Officer Sealock testified that his pat-down was of Defendant's outer clothing and that he did not place his hands inside Defendant's pants pockets until after he had determined that Defendant was in possession of crack cocaine and marijuana. He stated that, although he saw bulges in Defendant's pockets prior to commencing the frisk, he did not know what the bulges were and could not rule out the possibility that they were weapons. He testified that, based on his experience and training, he was able to determine that the objects in Defendant's pockets were narcotics as soon as he felt them.

The Court finds this search to be within the parameters of Terry and Yamba. The search was limited to the outer clothing. Officer Sealock had probable cause to believe that the objects in Defendant's pockets were narcotics prior to being sure that they

were not weapons. Indeed, he has significant training and experience in narcotics work, and testified that has done over 50 pat-downs where he found crack cocaine, so he is very familiar with the feel of the drug.[6] It is not unreasonable that he would have identified the objects as likely narcotics upon his initial frisk. He only further manipulated the objects to confirm they were contraband after developing probable cause, consistent with Yamba. Accordingly, his frisk was within the proper legal scope, and the seizure of the drugs was lawful.

### III.   Conclusion

For the reasons set forth herein, the Court finds that officers had reasonable suspicion and probable cause to stop Defendant's vehicle and sufficient reasonable suspicion to stop and frisk him, that the scope of the frisk was within the permissible limits, and that the drugs were properly seized. Therefore, Defendant's motion is denied in its entirety.

s/Alan N. Bloch
United States District Judge

ecf:   Counsel of record

---

[6] Because the charge in this case is that Defendant possessed crack cocaine with the intent to distribute, the parties have focused on Officer Sealock's retrieval of the crack moreso than his retrieval of the marijuana. However, the evidence supports that Officer Sealock properly seized the marijuana as well as the crack.